Hyman Wagman v. Commissioner.
Wagman v. Commissioner
Docket No. 26494.
United States Tax Court
1951 Tax Ct. Memo LEXIS 120; 10 T.C.M. (CCH) 836; T.C.M. (RIA) 51274; August 29, 1951
*120 Robert A. Littleton, Esq., 1021 Tower Bldg., Washington, D.C., for the petitioner. John O. Durkan, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Tax deficiencies with respect to income and fraud penalties have been determined by respondent as follows: Year
Deficiency
Penalty
1941
$ 705.40
$ 352.70
1942
24,199.90
12,099.95
1943
24,168.85
22,542.31
1944
1,490.04
883.73
1945
2,029.20
1,014.60
1946
22,102.00
11,051.00
Total
$74,695.39
$47,944.29
Numerous adjustments were made by respondent in arriving at these deficiencies. Petitioner has abandoned contest as to all except additions to income of $5,165.07 for 1942 $13,975.28 for 1943, and $31,832.13 for 1946. [1] Petitioner also attacks the fraud penalties imposed for all six years in issue. *121 Findings of Fact Petitioner is an individual who reported his income on a calendar year basis. His income tax returns for the years 1941 through 1946 were filed with the collector of internal revenue for the district of Indiana. Petitioner was born in Austria, and emigrated to the United States about 1898 at the age of fifteen. His education was limited to three grades of elementary school in Austria. He was married in 1909, and had two sons, one born in 1910 and the other in 1912. His wife died about 1939, and he remarried about 1941. He worked as a waiter in New York and Chicago until about 1906, when he came to Indianapolis. He had a cousin there who sold merchandise at wholesale. With instruction from his cousin, petitioner undertook the same kind of business, selling out of suitcases he carried from store to store. His operations were facilitated and extended by the purchase of a horse and wagon about a year and a half later. In 1912 he left Indianapolis for Springfield, Ohio. There he likewise sold from his horse and wagon, which he later replaced by a truck he bought in 1915 or 1916. By that time, too, he had opened a store at Springfield. In 1918 he moved back to *122 Indianapolis in order to be with his relatives, taking with him his entire Springfield stock of merchandise. He continued his general mercantile business in Indianapolis, until he liquidated it in 1929 and with his wife and two sons went to Austria. They returned to the United States in 1930. Shortly thereafter petitioner, with a partner who contributed $2,500, opened a store at New Castle, Indiana. About a year later he bought out his partner, and operated the business individually under the name of Wagman's Department Store (hereinafter also referred to as "the store"). After his return from Austria, petitioner also bought and operated several bankrupt retail businesses elsewhere in Indiana, but by 1940 and during the years in issue his only business was the store at New Castle. He operated this store as an individual proprietor until September 25, 1946, when he sold it and moved to California for reasons of health. The store consisted of three floors, which included a basement, and sold at retail general dry goods and men's and ladies' ready-to-wear clothes. A manager, a bookkeeper, and twelve or more sales clerks were employed. Petitioner also devoted his full time to the store. *123 Petitioner supervised the operation of the basement and main floor of the store; he checked merchandise when it was delivered to the store; occasionally he made sales at the store; and he bought merchandise for the departments he supervised. In order to buy merchandise, petitioner made frequent trips to New York City, Chicago, and places in Ohio, often using his own automobile for this purpose. Buying of ladies' ready-to-wear merchandise was done by the manager of the store, and he too had to travel. The manager also supervised the store's employees, whom he had power to hire and fire. Petitioner generally kept cash on hand in amounts ranging up to $20,000 and $30,000, hereinafter referred to as the "cash funds". These were petitioner's personal funds, and were kept at his house, in his vault, or in a cash box in a safe at the store. Petitioner had a bank account in his own name at the First National Bank at New Castle, hereinafter referred to as the "special account", and the store had a bank account in its name at the same bank, hereinafter referred to as the "store account". The special account was not listed on the books of the store. The store also kept a petty cash fund *124 on hand, which usually consisted of $200 to $300. Besides the special account, petitioner had nine bank accounts which were held jointly in his own name together with that of his wife or sons. Seven of these joint accounts were opened in 1943 by petitioner, who made the opening deposits in these accounts by transferring to them funds from his special account or the store account. The remaining two accounts were opened in 1946; the funds used to open these accounts did not come from any of the joint accounts, the special account or the store account. When petitioner went to New York on buying trips, he generally took with him about $10,000 from the cash funds. These sums were often used to pay expenses of the trips, a complete record of which was not usually kept by petitioner. They might also be used to pay for "black market" purchases of merchandise above the ceiling prices then in effect pursuant to law. These purchases could be made by petitioner only for cash. Upon his return from these trips, he told his bookkeeper the amounts spent for expenses, and she reimbursed him therefor. He also informed her of the amount spent by him for purchases, and in only one instance did he *125 fail to disclose to her the full amount paid for "black market" purchases. She likewise reimbursed him for cash he advanced to make these purchases, usually issuing store checks to him. Petitioner might deposit these checks in the special account, and then withdraw from it in order to replenish the cash funds, or he might cash these checks and replenish the cash funds from the proceeds. At times, however, the amounts restored to the cash funds were less than the amounts taken therefrom. So much of the amount originally taken out of the cash funds as remained unexpended at the end of a buying trip was put back in those funds at the trip's conclusion. Although petitioner made purchases at prices above the maximum prices in effect under law, he did not make sales at prices over applicable ceiling prices. His return for 1945, in itemizing the deduction by the business for "other expenses", listed "Payments under Sec. 205 (3) of Emergency Price Act" in the amount of $68. No evidence was introduced as to this entry on the return, and its accuracy and significance were not established. The cash funds were also used by petitioner to make loans to the store when it was short of cash and *126 had to meet obligations, as when invoices for merchandise purchases were received. Petitioner was repaid when store funds became sufficient, and repayment was made either directly in cash out of store sales or was made by store check, which petitioner might deposit in his special account. No record was made of these loans, other than notations by the bookkeeper in the store checkbook, where the amounts of the loans were added to the outstanding bank balance. In later years, as the business of the store improved, the need for these loans and their frequency decreased. As an accommodation, the store cashed pay checks of persons who were employed in the vicinity. Such checks were brought to the store on Thursdays or Fridays. Often the store funds were insufficient to cash all these checks, and petitioner would use his cash funds to cash the remainder. Petitioner retained the checks so cashed, and might deposit them in his special account. From time to time petitioner used the cash funds to make personal loans to various friends. When repaid, the amounts received by petitioner were deposited in his special account. Such a loan was made to Dann Brothers in the amount of $3,000, and *127 two loans of $5,000 each were made to the Fit-Rite Company in Indianapolis. While petitioner usually did not charge interest on these loans, he did charge and receive interest from Fit-Rite. Repayment to petitioner of these loans and payment to him of the interest was ascertained by respondent through audit of the store records, the bank records, and the records of the Fit-Rite Company. The manner in which the books and records of the store were kept was entrusted to the bookkeeper, who from about 1932 to about August, 1944, was Ruth Marley (and whose married name now is Ruth Garner). She recorded sales and other transactions entered into by the store. She issued estimated statements of profit and loss monthly, made by approximating the amount of profit, and issued annual profit and loss statements based on the actual data in the books. Sales and the incoming receipts were handled as follows: The clerk who made the sale rang it on the cash register, put the money in the register, and recorded it in a sales book. A sheet or ticket from the sales book was left with the sales register, and a duplicate of this sheet was given to the customer. At the end of each day, Miss Marley examined *128 each cash register, took the cash out except for an amount left for change purposes, checked the sales book and sales tickets, and recorded the sales readings. Records were kept of each clerk's daily sales, and records were also kept of sales according to departments. At times, particularly during Miss Marley's absence and after she left in 1944, the checking of cash registers was done by the manager or by petitioner. The sales proceeds were prepared by Miss Marley for deposit in the bank. Merchandise was sold only for cash. Sales were entered on the store's books by a debit to the bank account and a credit to the sales account. All the cash received from recorded sales was entered in the bank account on the books. There were a few occasions when money was withheld from sales proceeds for various purposes; here the sales tickets would be put through petty cash and the books were credited with the total amount of sales, and eventually all the money received from sales would wind up in the bank account per books. If there were any deposits made in the bank which did not appear in the bank account per books, that was an indication that those deposits had nothing to do with sales recorded *129 on the store's books. There is no evidence that this method of recording sales on the store's books was altered after Miss Marley left the store's employment. Occasionally petitioner made merchandise purchases for the store out of cash received from store sales and before it was deposited. At the end of each year, inventory was taken of the merchandise on hand. This was supervised by the manager, assisted by the bookkeeper. Inventory was taken and recorded at cost. Certain merchandise, such as "style merchandise", might be worth less than cost but was nevertheless recorded at cost in the inventory. Inventory records, based upon cost, were compiled by the bookkeeper, and given by her to petitioner. Petitioner's sons were also in the business of selling general merchandise, under the name of Wagman Brothers. Merchandise was often sent from the store to Wagman Brothers, and, conversely, the sons often sent their merchandise to the store. Separate records were kept at the store of shipments to the sons and shipments from them to the store. In both cases the amounts involved were recorded at the cost of the merchandise, with some allowance for freight, and at the end of the year *130 the difference between shipments and receipts was entered on the store's books of account. This difference represented only the cost of the merchandise, and contained no element of profit. In August 1944, two deputy collectors, from the office of the collector of internal revenue, visited the store to examine the books and records pertaining to petitioner's income tax returns for 1942 and 1943. Petitioner did not obtain accounting or legal advice in connection with this examination; it was, however, made in Miss Marley's presence. The deputy collectors found that petitioner's returns for 1942 and 1943 had understated his net income. They filled out an "amended" return for 1942, which petitioner signed, and a "corrected" return for 1943, which remained unsigned, both returns being filed in the collector's office on or about August 11, 1944. Both of these returns made certain adjustments; neither return included a penalty for failure to pay tax or for evasion of tax. On or about the same day the examination was made, petitioner paid an additional tax in accordance with these returns. Thereafter petitioner signed a document authorizing further audit of his books and records. In August *131 1944, petitioner hired a certified public accountant, Abraham A. Borts, to audit his books and put them in proper condition. In the intervening period of several weeks between the deputy collectors' examination and Borts' retention, Miss Marley resigned; another girl was later hired in her place. Borts caused the special account to be closed; later, however, unknown to Borts, petitioner reopened the special account on June 21, 1946. Borts found, in making bank reconciliations for the period January 1, 1944, through August 31, 1944, that there were $16,400 in bank deposits which were not entered or accounted for on the store's books. He attempted to trace the source of these deposits but could find no explanation for them; he spoke to petitioner about this, but the latter did not explain them to his satisfaction. Borts then entered these deposits on the books by treating them as unrecorded sales. He credited the entire amount, $16,400, to sales; $2,500 of this amount he debited to the store bank account, and the remainder of these deposits he debited to petitioner's investment account. Borts was not certain that these deposits came from unrecorded sales; he felt that "the best thing *132 in order to straighten out matters, would be to show these deposits as sales" and "to forget what was in the past". Borts did not make an audit with respect to the years 1942 and 1943; he considered these years to have been "taken care of" by the examination of the deputy collectors, and that petitioner's "best bet was to clean up '44". When petitioner was married in 1909, he had about $800 in cash. When he moved to Springfield in 1912, he was worth about $6,000. In 1914 petitioner bought a quantity of gloves for $5,000 to $5,600 from a factory which had a fire, and he had to borrow $2,000 of the purchase price, his funds being tied up in merchandise. The truck he bought, in the following year or two, cost $600 to $800 and was paid for in cash. When he moved back to Indianapolis in 1918, he was worth about $25,000; he brought $14,000 worth of merchandise back with him, and he also had some cash. His trip to and stay at Austria in 1929 cost about $4,000. When his first wife died in 1939, she left an estate of $6,000. For the period 1918 through 1940, petitioner filed income tax returns and paid income taxes as follows: Year
Return Filed
Tax Paid
1918
No
1919
No
1920
Yes
$ 37.04
1921
Yes
4.56
1922
Yes
No tax liability
1923
Yes
No tax liability
1924
Yes
No tax liability
1925
Yes
33.14
1926
Yes
No tax liability
1927
Yes
No tax liability
1928
Yes
No tax liability
1929
No
1930
No
1931
No
1932
Yes
No tax liability
1933
No
1934
No
1935
Yes
31.11
1936
Yes
84.39
1937
Yes
38.34
1938
Yes
No tax liability
1939
Yes
122.73
1940
Yes
19.36
*133 The foregoing information was contained in records kept by the collector of internal revenue. The returns themselves filed by petitioner during the period 1918 through 1940, or copies thereof, were not available. On the basis of the foregoing information, respondent determined that the maximum net income that petitioner could have received during those years, compatible with his returns, was as follows: Net
Year
Income
1918
$ 1,999.99
1919
1,99.99
1920
3,326.00
1921
3,414.00
1922
3,300.00
1923
3,300.00
1924
3,300.00
1925
7,246.00
1926
4,300.00
1927
4,300.00
1928
4,300.00
1929
3,499.99
Forward
$44,285.97
1930
3,499.99
1931
3,499.99
1932
2,500.00
1933
2,500.00
1934
2,777.78
1935
3,641.94
1936
5,121.94
1937
3,842.77
1938
2,777.78
1939
6,186.94
1940
3,291.94
Total
$83,927.04
Petitioner's investment in the store on January 1, 1941, as shown by the investment account in the store's records, was $35,113.26. Petitioner's net income for the calendar year 1941, as adjusted by respondent and conceded by petitioner, was $8,661.35. On December 31, 1941, the investment account showed a withdrawal of $11,975.91. Between *134 1918 and 1940 petitioner paid $7,000 for a house at Indianapolis and $9,160 for a house at New Castle. In 1941 petitioner bought an automobile for $900. The Indianapolis house remained unsold; the New Castle house was sold, proceeds of the sale not being received until 1947. The store was sold in September, 1946, for $71,887.37, paid by a check which petitioner deposited in an Indianapolis bank. Thereafter, petitioner and his wife went to Florida, to explore the possibility of settling there. They returned before the end of 1946, and at about the end of that year moved to California. The reduction in cash funds petitioner had on hand from the time he sold the business to the time he moved to California, was due to expenditures during that interval for living expenses. Petitioner filed income tax returns for the years 1941 through 1946. These returns were prepared by a Mr. Pentz for the years 1941 through 1943, and by Borts for the years 1944, 1945, and 1946. Petitioner furnished both Pentz and Borts with the information appearing on the returns for all these years, and petitioner was fully responsible for the inclusion or omission in those returns of matter affecting net income. *135 Petitioner received the profit and loss statements made by his bookkeeper, but he did not always look at them, and very often he disregarded the data on those statements in executing his returns for these years. In August 1946, Thelma M. Houser, a Federal internal revenue agent from the Indiana district, visited the store to investigate petitioner's returns. Petitioner was present when she arrived, and requested her to come back at a time when Borts could be present. Houser and Borts returned to the store thereafter, and together they examined the books and records, spending a whole day from about 8:30 a.m. to about 9:30 p.m. Petitioner was present at the time of this examination. Houser and Borts spent that day auditing the books, reconciling the tax returns with the books, reconciling the books with the amended and corrected returns, tracing entries, analyzing the investment account, and reconciling the profits per books with the profits per returns. Subsequently, Houser and Borts continued the audit, examining records, invoices and vouchers relevant to the years in question. By that time petitioner had already sold the store and moved to California, but he knew an investigation *136 was in process. The investigation did not end until more than a year after it began, and in its conduct Houser was assisted by another revenue agent, Thomas F. Hudgins, Jr. It resulted in adjustments of items of income and deduction reported by petitioner, and determination of the deficiencies and penalties above set forth. For 1941, petitioner reported net income and respondent made adjustments in petitioner's return as follows: Net income per return
$4,664.27
Add: (a) Net business profit increased
$2,182.30
(b) Excessive depreciation
56.25
(c) Travel expense
349.16
(d) Auto expense
356.66
(e) Miscellaneous expense
1,052.71
3,997.08
Net income corrected
$8,661.35
The only records available as to petitioner's income for 1941 were an investment account, which was in the form of a ledger sheet, and the return filed for that year. The investment account showed a credit of $7,102.71 for profit for 1941, whereas petitioner reported a profit of $4,920.41 on his return. The difference of $2,182.30 accounts for the first adjustment. No further explanation of the second adjustment was offered at the hearing. The last three adjustments were disallowances *137 of expense because of lack of substantiating records. For 1942 petitioner reported net income of $6,578.68. His amended return, filed after the above audit by the deputy collectors in 1944, reported net income of $30,173.91. The deficiency and penalty determined herein for 1942 were based on adjustments made in the income as originally reported, as follows: Net income per original return
$ 6,578.68
Add: (a) Unreported sales
$83,560.36
(b) Salaries and wages
369.50
(c) Depreciation
75.80
(d) Taxes
378.98
(e) Purchases
12,566.02
(f) Insurance
341.00
(g) Miscellaneous
370.00
(h) Auto expense
420.44
(i) Travel
649.66
(j) Medical expense
672.44
99,434.20
Total
$106,012.88
Deduct: (k) Purchases
$56,000.00
56,000.00
Net income corrected
$ 50,012.88
Adjustment (a), for unreported sales, was made up of two items: The first was $78,395.29, representing the difference between sales shown on the store's books in the amount of $162,421.22, and the sales reported on the original return in the amount of $84,025.93. This difference was included in the income reported in the amended return for 1942, which reported sales of $162,421.22. *138 Secondly, there were treated as sales $5,165.o7 in bank deposits for which no source could be found. These bank deposits, referred to as "unidentified" deposits, consisted of a total of $5,000 deposited in the store account, and a single deposit of $165.07 in the special account. The unidentified deposits in the store account consisted of $3,000 deposited on March 16, 1942; $500 deposited on July 6, 1942; and $1,500 deposited on September 5, 1942. Adjustment (b) was a disallowance of salary expense because, on the basis of the store books, it was considered to be a gift. This adjustment had been made on the amended return filed for 1942. No further explanation of the third adjustment was offered at the hearing. The amended return had decreased depreciation by $75. Adjustment (d) disallowed taxes which were shown by the books to be petitioner's personal Federal income tax. Adjustment (e), disallowing purchases, consisted of two items: (1) $591.11 in cash payments for which there was no explanation or any supporting documents. (2) $11,974.91 shown on the investment account to be a withdrawal. When the audit for 1942 had been made by the deputy collectors, they added this amount *139 into purchases, and increased the inventory at the end of the year by the same amount; and the matter was handled in this way on the amended return. There were no documents or substantiating records to show that this sum had been spent for purchases. The adjustment made in the earlier audit was therefore reversed, and the inventory was reduced to reflect the amount of actual inventory. Adjustment (f) disallowed premiums on insurance on petitioner's life. Adjustment (g) consisted of two items: (1)$150 shown on the books to have been paid to a doctor. (2) $220 shown by the books to have been cash withdrawn by petitioner. Adjustment (h) was made as follows: (1) The auto expense account on the books showed a debit of $900 for the purchase of a 1941 Dodge, and an offsetting credit of $625. The difference of $275 was disallowed as a capital expenditure. (2) The remainder of the account showed a series of cash expenditures, and there was no record of which were business and which were personal expenses. Fifty per cent of these expenditures was allowed. Adjustment (i) disallowed travel expense either because it was a personal expense or because it was unexplained. Adjustment (j) *140 reduced medical expense because the amount permitted as a deduction therefor was decreased as a result of the increase in income. Medical expense in the same amount had been eliminated on the amended return for 1942. The last adjustment accounted for the difference between purchases shown on the books, at $102,348, and reported on the original return, at $50,348. [2] Purchases had been increased on the amended return, although not by the same amount. For 1943 petitioner reported income tax net income of $3,668.92 and victory tax net income of $4,026.22. The corrected return filed for that year by the deputy collectors reported income tax net income of $42,463.07 and victory tax net income of $42,898.21. Respondent's adjustments for 1943 were as follows: Income Tax
Victory Tax
Net Income
Net Income
Net income per original return
$ 3,668.92
$ 4,026.22
Add: (a) Sales
$169,700.45
$169,700.45
(b) Purchase discounts
3,600.00
3,600.00
(c) Labor
1,454.30
1,454.30
(d) Inventory
4,102.18
4,102.18
(e) Salaries
382.00
382.00
(f) Repairs
25.00
25.00
(g) Purchases
1,583.03
1,583.03
(h) Personal expenses
1,611.61
1,611.61
(i) Auto expense
85.69
85.69
(j) Interest
283.23
182,827.49
283.23
182,827.49
Totals
$186,496.41
$186,853.71
Deduct: (k) Purchases
$110,000.00
$110,000.00
(l) Freight
1,954.30
1,954.30
(m) Light and power
200.00
200.00
(n) Miscellaneous
300.00
300.00
(o) Travel
67.00
67.00
(p) Bad check
28.00
28.00
(q) Depreciation
37.23
112,586.53
37.23
112,586.53
Net income corrected
$ 73,909.88
$ 74,267.18
*141 Adjustment (a), for sales, consisted of two items: (1) $155,725.17, to account for the difference between sales reported on the original return at $74,450.86, and sales shown on the store's books at $230,176. This adjustment is in error by $.03, and should be $155,725.14. [3] The corrected return for 1943 showed sales in the aggregate amount of $230,176. (2) $13,975.28, representing bank deposits for which no source could be found, and also referred to as "unidentified" deposits. These were, first, deposits in the special account of $4,175.28, consisting of deposits of $1,663.24 on January 26, 1943; $398 on May 10, 1943; $600 on June 8, 1943; $800 on August 27, 1943; $54 on October 7, 1943; and $660.04 on October 8, 1943. Secondly, there were unidentified deposits in the store account of $9,800, consisting of deposits of $5,000 on July 7, 1943; $3,600 on October 19, 1943; $1,200 on December 18, 1943. Adjustment (b) represented the difference between purchase discounts reported on the original return at $2,275.93, and shown on the books at $5,875.93. This adjustment had been *142 made on the corrected return. Adjustment (c) disallowed a deduction for labor because no account with that name or with such a balance was found on the books. This amount had also been disallowed on the corrected return. Adjustment (d) was made to account for an understatement in closing inventory. The inventory per books was $38,272.16, whereas the inventory shown on the return was $34,169.98. Adjustment (e) was a disallowance of salaries, because that amount was shown on the books as gifts. This amount was also disallowed on the corrected return. No further explanation was offered at the hearing as to adjustment (f). Adjustment (g) reduced purchases by an amount which the books showed to be cash withdrawals, and for which there were no purchase invoices. Adjustment (h) disallowed personal expenses which included petitioner's personal income tax for 1942 in the amount of $1,160.46; $341 for payments on insurance on petitioner's life, and $12.54 paid for insurance on petitioner's residence; $12.96 for an unexplained telephone call; and $84.65 for miscellaneous expenditures. Adjustment (i) represented disallowance of a percentage of unexplained auto expenses. Adjustment *143 (j) was made for interest credited to petitioner on seven savings and loan accounts, but not reported by him. These interest amounts were discovered on examination of records at the savings institutions concerned. The remaining adjustments increased petitioner's deductions. The first of these increased purchases, for the difference between the amount reported on the return and the amount shown on the books. The second, for freight, made allowance for an expense shown on the books but not reported on the return. No further explanation was offered at the hearing as to the rest of these adjustments. The deduction for a bad check, $28for, was also allowed on the corrected return. For 1944, petitioner reported income and respondent made adjustments as follows: Net income per return
$15,765.12
Add: (a) Interest
$1,317.88
(b) Purchases
501.58
(c) Unallowable personal expenditures
1,548.02
(d) Depreciation
28.13
3,395.61
Net income corrected
$19,160.73
Adjustment (a) combined two items: (1) An addition to income of $459.34 for unreported interest on the foregoing savings and loan accounts. (2) A disallowance of a deduction of $858.54 interest paid *144 on Federal tax. Adjustment (b) disallowed, as purchases, expenditures for personal purposes, including purchases of shoes and clothes. Adjustment (c) disallowed expenditures of $264.60 for personal insurance and $12.54 for insurance on petitioner's residence; $155.64 for light and water at petitioner's residence; $40.64 for a portion of petitioner's home telephone expense; $242 for auto expense; and $832.60 for travel expense. No further explanation was offered at the hearing as to the last adjustment. For 1945, petitioner reported net income and respondent made adjustments as follows: Net income per return
$ 8,945.92
Add: (a) Interest
$ 942.79
(b) Unallowable personal expenditures
3,989.97
4,932.76
Net income corrected
$13,878.68
The first adjustment was made to include interest income which petitioner failed to report, and consisted of: (1) Interest on the various savings accounts, totaling $422.79. (2) Interest on two loans of $5,000 each totaling $520. The second adjustment disallowed personal expenditures, as follows: Purchases
$ 39.38
Alteration and Tailoring
2.00
Auto expense
177.90
Display expense
139.62
Miscellaneous
12.80
Insurance
388.14
Laundry and cleaning
48.04
Light, water and heat
193.73
Office supplies
87.77
Repairs
60.95
Telephone and telegraph
37.92
Travel
2,801.72
Total
$3,989.97
*145 Items represented by these expenditures included food; pharmaceuticals; utility services at petitioner's residence; personal insurance; personal laundry, and cleaning a mink coat; and purchases at Indianapolis and New York retail department stores. Some of the expenditures were disallowed because they were unexplained and unsubstantiated. For 1946 petitioner reported net income and respondent made adjustments as follows: Net income per return
$16,926.13
Add: (a) Interest
$ 1,132.32
(b) Unallowable personal expenditures
3,448.96
(c) Sale of capital assets
11.25
(d) Other income
31,832.13
(e) Travel expense
1,961.74
38,386.40
Net income corrected
$55,312.53
Adjustment (a) was made up of: (1) $593.47 in interest on various savings accounts. (2) $538.85 in bond interest coupons deposited at the First National Bank at New Castle. Adjustment (b) disallowed the following as personal expenditures: Purchases
$ 275.00
Auto expense
308.64
Miscellaneous
131.71
Insurance
409.73
Laundry
69.71
Power and light
87.53
Miscellaneous
31.55
Repairs and maintenance
47.80
Telephone
31.60
Travel
2,049.39
Water
6.30
$3,448.96
*146 No further explanation was offered at the hearing as to the third adjustment. Adjustment (d) was made to include in petitioner's reported income deposits which were unidentified as to source (also referred to as "unidentified" deposits), and which were made in petitioner's special account or in savings and loan accounts which he held jointly with his wife or sons. Petitioner made the following deposits: Institution
Date
Amount
Citizens Building & Loan
Feb. 2
$ 2,000.00
Citizens Building & Loan
Dec. 11
5,000.00
Henry County Bldg. & Loan
Feb. 2
100.00
Henry County Bldg. & Loan
Dec. 9
500.00
Henry County Bldg. & Loan
Dec. 19
34.20
Henry County Bldg. & Loan
Dec. 28
158.00
Union Fed. Sav. & Loan
Jan. 10
1,000.00
Colonial Sav. & Loan
Jan. 11
500.00
Colonial Sav. & Loan
Apr. 26
1,000.00
Railroad Men's Fed. Sav. & Loan
Jan. 10
500.00
Railroad Men's Fed. Sav. & Loan
Apr. 27
400.00
Atkins Sav. & Loan
Jan. 10
1,000.00
Atkins Sav. & Loan
Apr. 25
1,000.00
Fletcher Ave. Sav. & Loan
Jan. 10
500.00
Fletcher Ave. Sav. & Loan
Apr. 25
100.00
Shelby Street Sav. & Loan
Jan. 10
1,000.00
Shelby Street Sav. & Loan
Apr. 26
1,000.00
Celtic Fed. Sav. & Loan
Jan. 10
500.00
Celtic Fed. Sav. & Loan
Apr. 25
1,500.00
Subtotal
$17,792.20
Special Account (First Nat. Bank of New Castle)
June 21
$ 1,220.04
Special Account (First Nat. Bank of New Castle)
July 23
48.00
Special Account (First Nat. Bank of New Castle)
Aug. 21
250.00
Special Account (First Nat. Bank of New Castle)
Aug. 28
1,190.90
Special Account (First Nat. Bank of New Castle)
Sept. 21
138.96
Special Account (First Nat. Bank of New Castle)
Oct. 3
421.20
Special Account (First Nat. Bank of New Castle)
Oct. 11
2,500.00
Special Account (First Nat. Bank of New Castle)
Dec. 5
373.00
Special Account (First Nat. Bank of New Castle)
Dec. 7
150.08
Special Account (First Nat. Bank of New Castle)
Dec. 13
1,293.75
Special Account (First Nat. Bank of New Castle)
Dec. 20
2,000.00
Special Account (First Nat. Bank of New Castle)
Dec. 28
5,088.85
Subtotal
$14,674.78
Grand Total
$32,466.98
*147 Of these deposits, the one on July 23 for $48 was explained, and two further sums of $538.85 and $96 were also accounted for and traced into the deposits. The total net amount remaining unexplained was therefore $31,784.13. Of the total of $31,784.13, at least $5,837.93 represented deposits of checks from persons other than petitioner, his wife and sons. Adjustment (e) disallowed expenses incurred in making the trip to Florida taken by petitioner and his wife after sale of the New Castle store. Petitioner had no satisfactory explanation for his failure to report his entire business profit for 1941. He claimed that it was due to his practice of excluding merchandise shipped to his sons. But he admitted that such sales were not entered on the books at a profit in the first place. Although he claimed that the reported profit was calculated by him on some basis independently of the business books, he was unable to explain the manner in which he arrived at that amount of profit. Petitioner was also unable to account for his failure to report the total store sales made in 1942. He relied on the shipments of merchandise to his sons, and on "depreciation on certain merchandise", but *148 he was unable to explain why these factors should reduce sales. He also stated that he used cash from sales to make purchases, but denied that any part of these sales had not been recorded. Finally, he suggested that the understatement may have been due to some of the sales records having been lost. Similarly, petitioner was unable to explain why he only reported sales of $74,450.86 for 1943, while his books showed sales of $230,176. Petitioner was also unable to explain the understatement by $52,000 of purchases reported for 1942, or by $110,000 in 1943 purchases. He could not explain, furthermore, his failure to report purchase discounts of $3,600 received for 1943. Except for the expenditures connected with his trip to Florida after he sold the store at New Castle, petitioner offered no explanation for inclusion in his return, as business expense, of the many items of personal expense mentioned above. At the time of the audit, when these items were analyzed by agent Houser together with Borts, Borts was unable to give any explanation as to the reason for deducting these items on the return. As to the unreported interest on the savings accounts, petitioner offered shifting *149 reasons for its omission. He first testified that the interest on the savings accounts was omitted because it was only credited to his accounts but he never actually withdrew it; then he stated that he did not know the actual amount of the interest, never checking the pertinent records; and, finally, his explanation was that he regarded the funds in the accounts as not belonging to him but to his joint depositors. But petitioner knew that the savings deposits bore interest; and he knew that he could find out the amount of interest earned by his savings accounts, and that interest was taxable income. He testified that interest paid on the Fit-Rite loan was not reported because he considered it an item of personal income not to be reported with his business income. Petitioner was unable to give a satisfactory explanation of his understatement of his closing inventory for 1942 in the amount of $11,974.91. Similarly, petitioner was unable to explain a write-down by $4,102.18 in closing inventory for 1943. The 1942, 1943 and 1946 unidentified deposits were shown on the records of the various banks involved, but were not recorded in the bank accounts on the store's books. Petitioner *150 concedes that these deposits were made in the amounts and on the dates asserted by respondent. All these deposits were made from funds or bank accounts owned by petitioner. The agents compared the bank deposits per books with the bank deposits per bank records, and then attempted to trace the source of excess deposits shown by the bank records. They asked Borts and other persons for an explanation of these deposits; during the entire audit, no explanation was made of these deposits. In the course of the audit, the agents traced some deposits to transfers between various bank accounts of petitioner; and to repayments to petitioner of loans made by him, such as the Fit-Rite and Dann Brothers loans. Deposits for which such sources were found were not included in the unidentified deposits added to income. Neither were there included deposits for which an explanatory item, even in approximate amount, was located on the store's books, or for which a reasonable explanation was offered. In examining the books for an explanation of the unidentified deposits, the agents did not check the sales accounts or records. They did not check the flow of proceeds from recorded sales, to see whether *151 they might have been the source of the questioned deposits; they did not check the sales records against deposits shown on the bank records, or reconcile sales with bank deposits; they did not take periodic bank balances and bank deposit totals, and compare them with sales for the period involved. An investment account on the store's books recorded withdrawals by petitioner from the business. The agents compared withdrawals shown in this account with deposits they were unable to identify. No withdrawal was found in an amount similar to the amount of any of the unidentified deposits. Some withdrawals were identified as having been used by petitioner to make loans; there were such withdrawals of $2,000, $4,350, $750, and $5,000. There were, however, other cash withdrawals the disposition of which was not established, such as the withdrawal of $11,975.91 in 1941, $4,003.08 in 1944, and $4,503.09 in 1945. The investment account showed a debit of $24,500 on January 3, 1943. The contra credit on the books, for this debit, was to the store bank account. The explanation appearing next to this debit indicated it to be a withdrawal. But none of the bank records examined by the revenue agents *152 showed a withdrawal in that amount, and there was no withdrawal in that amount from the store account on that date or any later date. Although in the notice of deficiency the unidentified deposits were included in sales for 1942 and 1943, the agents did not know that they were the proceeds or profits of unrecorded sales. They regarded these deposits as representing unexplained and unreported income, and were influenced to treat them as the proceeds of unrecorded sales because in 1944 Borts had similarly treated unidentified deposits. For 1946, the notice of deficiency added the unidentified deposits into "other income" rather than sales. Petitioner was unable to explain satisfactorily the source of these unexplained deposits. Petitioner had no sources of income of any consequence other than his store, apart from interest already noted and rent from a house which was accounted for in his returns. The unidentified deposits for 1942, 1943 and 1946 were not taxable income in those years, and a deficiency in tax is not owing for those years on account of these unidentified deposits. A part of the deficiency owing for each of the years 1941, 1942, 1943, 1944, 1945, and 1946, was *153 due to fraud with intent to evade tax. Opinion RAUM, Judge: Section 293(b) of the Internal Revenue Code provides that "If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency)" shall be assessed, collected and paid. Respondent determined a deficiency in petitioner's income tax for each of the calendar years 1941 through 1946, and for each of these years he also added an ad valorem penalty under Section 293(b). Although the amount of the penalty for a particular year is calculated on the basis of the "total amount of the deficiency" owed for that year, to incur that penalty it is only requisite that "any part" of the deficiency be the result of fraud with intent to evade tax. Fraud as to part of a deficiency will sustain a penalty based on the entire deficiency, and therefore, while the burden is on respondent to show by clear and convincing proof the validity of the *154 determined penalties (see I.R.C. Section 1112; M. Rea Gano, 19 B.T.A. 518, 532-533), that burden is satisfied respecting the penalty for a specific year if any part of the deficiency for that year is established by such proof to be of fraudulent origin. See Russell C. Mauch, 35 B.T.A. 617, 625, affirmed, 113 Fed. (2d) 555 (C.A. 3); Ollie V. Kessler, 39 B.T.A. 646, 653-654. We regard the evidence to be clear and convincing that at least part of each deficiency determined for the years in question was due to fraud with intent to evade tax. As to the residue of those deficiencies, it is unnecessary to decide whether or not they were, in whole or in part, similarly caused; we consider only portions of the deficiencies because they suffice to support fraud penalties. The adjustments made by respondent in arriving at the determined deficiencies were many, and all except three of these are not contested by petitioner. The effect of the uncontested adjustments was approximately to triple the net income reported by petitioner for the six years in issue, the total reported income of some $56,000 being increased *155 to about $170,000 by those adjustments. While far from conclusive, the mere number and dollar-amount of the unchallenged adjustments, and the relation of reported net income to true net income, tend to negate accident or innocent omission as the cause for petitioner's failure to accurately return his net income. They rather indicate an intentional understatement of net income or a deliberate disregard for its true report. Cf. Rogers v. Commissioner, 111 Fed. (2d) 987, 989 (C.A. 6); Harry Feldman, 34 B.T.A. 517, 520. The inference thus drawn, of a wilful failure to render proper account and a design to evade tax liability, is amply reinforced by an examination of the delinquencies responsible for the uncontested adjustments. For 1941 petitioner reported profit from his department store at New Castle, Indiana, of $4,920.41; he failed to report additional store profit of $2,182.30 shown by the business records. For this bald understatement of income he had no acceptable explanation, and we are convinced that it was a deliberate omission due to fraud with intent to evade tax. Cf. Chas. F. Long, 12 B.T.A. 488, 490; Kenney v. Commissioner, 111 Fed. (2d) 374, 375 *156 (C.A. 5). For 1942 petitioner reported only about one-half of the store sales, and for 1943 about one-third of the sales; of sales shown on the store books of about $162,000 and $230,000, respectively, for those years, he reported only some $84,000 and $75,000. These very substantial understatements remained without satisfactory explanation and likewise must be regarded as due to fraud with intent to evade tax. For both these years adjustments were also made in amounts reported by petitioner as purchases but disallowed by respondent as cash withdrawals; for these delinquencies no explanation was made, and they too must be taken as the product of an intent to evade tax. Petitioner, furthermore, understated by $3,600 purchase discounts received in 1943, and this omission was also unexplained and can only be attributed to a fraudulent intent. For 1944, 1945 and 1946 petitioner excluded from his returns interest income in the respective amounts of $459.34, $942.79, and $1,132.32. This was interest petitioner received on savings deposits, on personal loans made by him, and on bonds. The record shows no excuse for failure to report this income. Although petitioner knew that the interest *157 was taxable income, he deliberately failed to disclose it in order to evade tax. Cf. Harris v. Commissioner, 174 Fed. (2d) 70, 72 (C.A. 4). Finally, we refer to the continual and extensive treatment of personal expense as business expense throughout the years 1942 through 1946. We find here more than a case of mistake or erroneous judgment, but a persistent, false inflation of deductions. During each of these years, petitioner indiscriminately charged to the business personal auto and travel expense, such as hotel bills at Atlantic City and at Hot Springs, Arkansas, and the cost of insurance on his life; for 1942 and 1943 he deducted his personal income tax as a business expense; for 1943 through 1946 he deducted, as a business expense, the cost of insurance on his home, and he did likewise for 1944 through 1946 with respect to utilities expense in maintaining his home; for 1945 and 1946 he deducted miscellaneous personal purchases, and personal laundry and cleaning expenses, including one for cleaning a mink coat. This pattern of repeated distortion of net income further evidences a fraudulent understatement of income with intent to evade taxes. Cf. Joseph H. Imeson, 14 T.C. 1151, 1158-1159; *158 John McKeon, 39 B.T.A. 813, 821. In many instances petitioner testified that he disregarded or ignored profit and loss statements furnished him by the store bookkeeper, or data which he knew was contained in the books and records of the business. Such conduct is not, of course, a defense to a charge of fraudulent evasion of taxes. If anything, it supports the charge. Cf. Albert A. Levin, 36 B.T.A. 1168, 1172. The plain duty of a taxpayer is to apprise himself at least of information accessible to him and which is necessary for an accurate report of his income. He cannot escape that obligation, or the penalty imposed for deliberately evading it, by wilfully turning his back to relevant information available to him. The evidence is therefore very clear and convincing in support of the imposition of fraud penalties for the years in question. The respondent's burden of proof in this regard was fully met. Petitioner challenges the deficiencies with respect to basic tax liability for the years 1942, 1943 and 1946, to the extent that respondent included in his income *159 for those years bank deposits of $5,165.07, $13,975.28 and $31,832.13, respectively. The 1942 and 1943 deposits were made by petitioner in a bank account in the name of the New Castle store and in a special account in his own name, and the 1946 deposits were made by him in the special account and in certain bank accounts he opened in his name jointly with his wife or sons. These deposits were disclosed by the records of the bank involved, but were not shown on the books of account of the store. Respondent, in order to ascertain the source of these deposits, examined the banks' records, records of certain debtors of petitioner, and petitioner's books and records, and questioned petitioner and his accountant and other persons who might be familiar with petitioner's affairs. The identity of the source of these deposits remained unascertained. Respondent therefore treated them as unreported sales for the first two years, although for the last year he treated these deposits as "other income". During these three years, petitioner derived income from the New Castle store, the revenues of which depended on sales, and from interest on loans and savings accounts. The record shows these to *160 have been the only sources of income for petitioner, apart from rents he received on his Indianapolis home, which were accounted for on his returns. He had no other sources of income. The only possible source of unreported income, from which the so-called unidentified deposits might have been derived, is therefore narrowed to unrecorded sales from the store. To be sure, there is confused testimony by the petitioner from which it could be inferred that there were some unrecorded sales. But we are convinced by the testimony of the store bookkeeper, Ruth Marley, who appears to be reliable and trustworthy, and who was in an excellent position to know the manner and extent to which sales were recorded on the books, that there were no unrecorded sales. Miss Marley was charged with the duty of checking daily sales made by all the clerks and keeping proper records of such sales. She testified that no merchandise was sold other than for cash; that the store clerks made sales tickets for all sales, and these sales were checked and the proceeds collected by her daily; that she recorded the aggregate sales on the books and deposited the proceeds in the bank. She testified that when, on occasion, *161 cash proceeds were withheld from sales for some purpose prior to their deposit, the tickets would be put through petty cash and that eventually all the money received from sales would wind up in the bank account per books. Respondent suggests that petitioner made sales above ceiling prices, that these sales were not entirely recorded, and that the deposits may have come from proceeds of such sales. The proof, however, fails to establish any sales other than those made in the normal course of business that were fully reflected in the records of the enterprise. We are satisfied by the evidence as a whole that there were no unrecorded sales which could have been a possible source of the unidentified deposits, and, since we have found that there was no other possible source of income, we are compelled to conclude that the record establishes that these deposits were not derived from unreported income in the respective years in question. The amounts of the fraud penalties for 1942 and 1943 are alleged to be excessive by reason of the "amended" return filed for 1942 and the "corrected" unsigned return filed for 1943. Those returns reported additional amounts of net income, and petitioner *162 seems to argue that the penalties must accordingly be decreased because of a resulting decrease in the deficiencies. The contrary, however, is now well established in this Court. It is the original return, unaffected by admission of additional tax liability in later amended returns or the later payment of additional tax, that governs the amount of penalty. Arlette Coat Co., 14 T.C. 751, 756; Harry Sherin, 13 T.C. 221, 229-230; Aaron Hirschman, 12 T.C. 1223; Maitland A. Wilson, 7 T.C. 395. Neither do the derelictions, in making the original reports of income, become disqualified to establish fraud just because they were disclosed voluntarily in the returns later filed for 1942 and 1943. Amended returns are insufficient to purge the fraud in an original return. Cf. Herbert Eck, 16 T.C. 511; Harry Sherin, supra, at 229. And, even if this were not so, petitioner's position would still not be aided, since there were other *163 fraudulent irregularities in the original 1942 and 1943 returns which remained uncorrected in the later returns. Petitioner attempts to interpose as a bar these later 1942 and 1943 returns, which were executed as a result of an audit by two deputy collectors, on the ground that they were "good and sufficient for all legal purposes". In this regard petitioner relies on Section 3612 of the Code, [4] which could apply here only on the assumption that petitioner's original returns were fraudulent. Petitioner seems to assert, first, that these returns prevent imposition of fraud penalties for those years because the deputy collectors made no finding of fraud and sought no such penalties, and, secondly, that they barred determination of deficiencies greater than those found by the deputy collectors. *164 The purpose of Section 3612 was to strengthen the hand of the Government in dealing with taxpayers who either filed no returns or filed fraudulent returns. It is extraordinary to suggest that when the Commissioner seeks to avail himself of a remedy afforded by Section 3612, the taxpayer is automatically relieved of accountability for his fraud or for further deficiencies which the investigation failed to disclose. And there is indeed grave doubt whether an amended return or a deputy collector's action would produce such an attractive result for one who is guilty of fraud. Cf. E. L. Harris, 5 B.T.A. 1026, 1028; Thomas J. McLaughlin, 29 B.T.A. 247. Even less ground exists for imposing such disabilities on the Commissioner in this case, where the taxpayer expressly consented to further investigation of his liability. It is to be observed, moreover, that Section 3612 makes a deputy collector's returns only prima facie "good and sufficient" when "approved by the Commissioner", and explicitly authorizes the Commissioner to amend such a return. Finally, it is not clear *165 that the returns in question were executed in accordance with Section 3612. The amended return for 1942, although prepared by a deputy collector, was signed by petitioner himself, and was therefore not a return made by the collector, a deputy collector, or the Commissioner. The "corrected" return for 1943 was not signed by anyone. [5]
We conclude that the basic deficiency attributable to the uncontested items for each of the years, 1941 through 1946, was due at least in part to fraud with intent to evade tax, but that the deficiencies for the years 1942, 1943, and 1946 may not include any amount attributable to the so-called unidentified bank deposits. Decision will be entered under Rule 50. Footnotes
1. In his opening statement at the trial, petitioner's counsel stated that two additional errors were still being asserted: (1) Respondent's failure to adjust inventory when, for 1942, he disallowed purchases amounting to $11,974.91. (2) An "item of $13,000, which we will endeavor to show is cash paid for merchandise that didn't get on the books as part of the cost of merchandise sold." Adequate evidence is lacking for consideration of these contentions, and on brief petitioner completely omitted to deal with them. These allegations of error are therefore deemed abandoned.↩
2. The difference, of course, is $52,000 and not $56,000, as shown in adjustment (k). Respondent has not sought correction of this error.↩
3. The statement attached to the letter of deficiency, at p. 6, apparently admits this error of $.03.↩
4. SEC. 3612. RETURNS EXECUTED BY COMMISSIONER OR COLLECTOR. (a) Authority of Collector. - If any person fails to make and file a return or list at the time prescribed by law or by regulation made under authority of law, or makes, willfully or otherwise, a false or fraudulent return or list, the collector or deputy collector shall make the return or list from his own knowledge and from such information as he can obtain through testimony or otherwise. (b) Authority of Commissioner. - In any such case the Commissioner may, from his own knowledge and from such information as he can obtain through testimony or otherwise - (1) To Make Return. - Make a return, or (2) To Amend Collector's Return. - Amend any return made by a collector or deputy collector. (c) Legal Status of Returns. - Any return or list so made and subscribed by the Commissioner, or by a collector or deputy collector and approved by the Commissioner, shall be prima facie good and sufficient for all legal purposes. * * *↩
5. There is also a question as to whether petitioner is in a position to rely upon Section 3612↩. He has not raised the point in his pleadings, and since the objection is in the nature of an affirmative defense, it may be that he is now barred by the rule that an affirmative defense must be pleaded in order to be asserted.